UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JOHN RICHARDSON,                    :
                                    :
              Plaintiff             :     No. 4:11-CV-00734
                                    :
       vs.                          :     (Judge Kosik)
                                    :                    FILED
MICHAEL J. ASTRUE,                  :                    SCRANTON
COMMISSIONER OF SOCIAL              :
SECURITY,                           :                    JUL 0 2 2012
                                    :
              Defendant             :     _____
                                          PER _____
                          MEMORANDUM             DEPUTY CLERK

**Background**

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff John Richardson's claim for social security disability insurance benefits.

Richardson protectively filed[1] his application for disability insurance benefits on October 3, 2007.  Tr. 10, 42, 79 and 88.[2]  The application was initially denied by the Bureau of Disability Determination on March 24, 2008.[3]  Tr. 43-46.  On May

_____

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on June 30, 2011.

3.  The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability
                                              (continued...)

27, 2008, Richardson requested a hearing before an administrative law judge. Tr. 47-48.  After a little over 13 months had elapsed a hearing was held before an administrative law judge on July 8, 2009. Tr. 20-40.  On September 21, 2009, the administrative law judge issued a decision denying Richardson's application. Tr. 10-19.  On October 7, 2009, Richardson filed a request for review with the Appeals Council. Tr. 6.  After about 16 months had passed, the Appeals Council on February 23, 2011, concluded that there was no basis upon which to grant Richardson's request for review. Tr. 1-5.  Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Richardson then filed a complaint in this court on April 18, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on September 20, 2011, when Richardson filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is

---

3.   (...continued)
insurance benefits on behalf of the Social Security Administration.   Tr. 43.

4.   Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."   M.D.Pa. Local Rule 83.40.1.

undisputed that Richardson meets the insured status requirements of the Social Security Act through December 31, 2012. Tr. 10, 12 and 88.

Richardson, who was born in the United States on July 24, 1963,[5] graduated from high school and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 17, 42, 79, 91, 98 and 118.  During his elementary and secondary schooling Richardson attended regular education classes. Tr.98.  After high school Richardson completed 2 years of college. Id.

Richardson has a substantial work and earnings history. He has past relevant work experience[6] as a milieu counselor at a juvenile residential treatment center described by a vocational expert as semi-skilled, light to medium work; a New York City inspector for a fish market described as semi-skilled, light work; a residential aide at a homeless shelter described as unskilled, light work; and a security guard at a law firm described as semi-

---

5.  At the time of the administrative hearing Richardson was 45 years of age and at the time of the administrative law judge's decision 46 years of age.  The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  Richardson is considered a "younger individual" whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. § 404.1563(c).

6.  Past relevant employment in the present case means work performed by Richardson during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

skilled, light work.[7] Tr. 33-34, 93, 103 and 126.   Richardson also

worked as a Federal Express courier from October 1986 to March

---

7.   The terms sedentary, light, medium and heavy work are defined
in the regulations of the Social Security Administration as
follows:

> (a) *Sedentary work.* Sedentary work involves lifting no
> more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and
> small tools.  Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job
> duties.  Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are
> met.

> (b) *Light work.*  Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that he or
> she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

> (c) *Medium work.*  Medium work involves lifting no more
> than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds.  If
> someone can do medium work, we determine that he or she
> can do sedentary and light work.

> (d) *Heavy work.*  Heavy work involves lifting no more
> than 100 pounds at a time with frequent lifting or
> carrying of objects weighing up to 50 pounds. If
> someone can do heavy work, we determine that he or she
> can also do medium, light, and sedentary work.

20 C.F.R. § 404.1567.

1991 and as a warehouse manager at a clothing manufacturer from June 1983 to August 1986. Tr. 33, 93 and 126.

Records of the Social Security Administration reveal that Richardson had earnings in the years 1981 through 2007 as follows:

| Year | Earnings |
|------|----------|
| 1981 | $ 1308.32 |
| 1982 | 2008.16 |
| 1983 | 3350.00 |
| 1984 | 15700.00 |
| 1985 | 21200.00 |
| 1986 | 21587.04 |
| 1987 | 37223.35 |
| 1988 | 42128.14 |
| 1989 | 36070.10 |
| 1990 | 50553.90 |
| 1991 | 12263.33 |
| 1992 | 16922.80 |
| 1993 | 22422.56 |
| 1994 | 1917.86 |
| 1995 | 12495.07 |
| 1996 | 21840.76 |
| 1997 | 21931.88 |
| 1998 | 27577.83 |
| 1999 | 28718.74 |
| 2000 | 32033.78 |
| 2001 | 1028.91 |
| 2002 | 3483.20 |
| 2003 | 48937.86 |
| 2004 | 40782.10 |
| 2005 | 36435.31 |
| 2006 | 40260.34 |
| 2007 | 5416.59 |

Tr. 87. Richardson's total earnings were $605,597.93. Id.

Richardson claims that he became disabled on November 23, 2006, because of spinal stenosis[8] causing pain in his lower

---

8.  Spinal stenosis is a medical condition in which the spinal canal narrows and compresses the spinal cord and nerves.

(continued...)

back which radiates down his right buttock to his lower extremity, numbness in his legs, some discomfort in his neck and numbness in his right hand. Tr. 92; Doc. 8, Plaintiff's Brief, p. 2. Richardson has not worked since November 23, 2006. Id.

For the reasons set forth below we will affirm the decision of the Commissioner denying Richardson's application for disability insurance benefits.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is

---

8.   (...continued)
"Depending on which nerves are affected spinal stenosis can cause pain or numbness in your legs, back, neck, shoulders or arms; limb weakness and incoordination; loss of sensation in your extremities; and problems with bladder or bowel function. Pain is not always present, particularly if you have spinal stenosis in your neck." Spinal Stenosis, Mayo Clinic staff, http://www. mayoclinic.com/health/spinal-stenosis/DS00515 (Last accessed June 25, 2012). The medical records reveal that Richardson's spinal stenosis was congenital and involved the entire lumbar spine. Tr. 177. Congenital is defined as "existing at, and usually before, birth, referring to conditions that are present at birth, regardless of their causation." Dorland's Illustrated Medical Dictionary, 403 (32nd Ed. 2012). Although the medical records further reveal that Richardson is morbidly obese (being 6 feet tall and weighing well above 300 pounds) he does not alleged that his obesity contributes to his inability to work.

to determine whether those findings are supported by "substantial evidence."  Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001);  Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight

7

of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).
Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance and supplemental security income
claims.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This
process requires the Commissioner to consider, in sequence,
whether a claimant (1) is engaging in substantial gainful
activity,[9] (2) has an impairment that is severe or a combination
of impairments that is severe,[10] (3) has an impairment or

---

9. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit."  20 C.F.R.
§ 404.1510.

10.  The determination of whether a claimant has any severe
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no
impairment or combination of impairments which significantly
limits the claimant's physical or mental abilities to perform
(continued...)

9

combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

_____

10.  (...continued)
basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2).  An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

11.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

12.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. <u>Id</u>; 20 C.F.R. § 404.1545; <u>Hartranft</u>, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical and Other Evidence**

The medical records reveal that Richardson was only treated for physical problems.

The first medical record we encounter is from November 27, 2006, when Richardson visited the emergency department at Pocono Medical Center, East Stroudsburg, Pennsylvania, complaining of low back pain and numbness. Tr. 172-176.  The results of a physical examination of Richardson were essentially normal, including he had a normal gait and normal reflexes. Tr. 173-174. It was also observed that "[l]umbar spine" and "CVA tenderness"[13]

---

13. "CVA" refers to the costovertebral angle which is the acute angle formed between the lowest rib and the vertebral column.

(continued...)

11

was "[a]bsent." Tr. 174.  A CT scan of the lumbar spine revealed
"[m]oderate to severe congenital spinal stenosis of the entire
lumbar spine." Tr. 177.  Richardson was prescribed pain
medications and discharged from the hospital. Tr. 173.  At
discharge it was noted that Richardson "ambulates without
assistance" and that he was driving. Id.  The final diagnosis was
that Richardson suffered from "severe low back pain with
intermittent perineal numbness."[14] Tr. 172.

On November 29, 2006, Richardson had an appointment with
John R. Cifelli, M.D., a neurosurgeon, located in Bethlehem,
Pennsylvania. Tr. 179-180.  With regard to Richardson's subjective
complaints Dr. Cifelli stated that Richardson complained of
"numbness in his lower extremities and saddle area" which had
"been going on for several months." Tr. 179.  Richardson told Dr.
Cifelli that "he feels fine when he is sitting down, but anytime

---

13.   (...continued)
Pain at this area is usually attributed to kidney disease.
Costovertebral Angle -definition of costovertebral angle in the
Medical Dictionary - by the Free Online Dictionary, Mosby's
Medical Dictionary, 8th Edition, 2009, http://medical
-dictionary.thefreedictionary.com/costovertebral+angle (Last
accessed June 25, 2012).

14.   Perineal numbness is numbness in the groin and buttocks
area. It is a condition often suffered by cyclists as a result of
pressure exerted on nerves and blood vessels when sitting on a
bicycle seat. Groin Numbness and Bike Riding, http://www.
medicinenet.com/script/main/art.asp?articlekey=84072
(Last accessed June 25, 2012).  In Richardson's case it was most
likely caused by the spinal stenosis of the lumbar spine.

he tries to walk distances greater than 1/10 of a mile, he experiences saddle area numbness, as well as numbness in the posterior aspects of his legs." Id.   Richardson stated that "when he sits down, the numbness diminishes right away." Id.  He further told Dr. Cifelli that his low back pain is "well-controlled with medications" and "never radiates into the extremities."  Id.    The results of a physical examination were essentially normal other than "mildly decreased range-of-motion in the lumbar spine secondary to pain" and absent deep tendon reflexes. Id. Richardson had a normal, nonantalgic and nonataxic gait.[15] Id.  He was able to heel walk[16] and tandem walk[17] without difficulty; he had full/normal (5/5) motor strength in the lower extremities; his sensation was intact to light touch bilaterally; a straight leg

---

15.  Antalgic is defined as "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." Dorland's Illustrated Medical Dictionary, 97 (32nd Ed. 2012). Ataxic (or atactic) is defined as "lacking coordination; irregular; pertaining to or characterized by ataxia."  Ataxia is defined as "failure of muscular coordination; irregularity of muscular action." Id. at 170-171.

16.  The heel walk test requires the patient to walk on his heels. The inability to do so suggests L4-5 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed June 26, 2012).

17.  A tandem walk or gait is a method of walking where the toes of the back foot touch the heel of the front foot at each step.

13

raise test was negative;[18] and the Babinski sign was not present."[19] Id.   Dr. Cifelli's assessment was as follows: "This is a 43-year-old-male with a chief complaint of saddle area and lower extremity numbness with walking, and . . . stenosis on CT scan.  He will likely require a multi-level lumbar decompression, however in order to fully evaluate this for surgical planning, we will need to check an MRI of the lumbar spine.  This was scheduled today, and the patient will return then for follow-up after this next study has been done." Tr. 180.  There is no indication that Richardson followed up with Dr. Cifelli.

The record contains a single-page document entitled "Disability Certificate" from Robert A. Adair, M.D., P.A., dated November 30, 2006.  Tr. 260.  In that document Dr. Adair in a

---

18.  The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed June 26, 2012).

19.  The plantar response is a reflex of the foot tested by "scraping an object across the sole of the foot beginning from the heel, moving forward toward the small toe, and then arcing medially toward the big toe."  This test is normal if there is a "downward contraction of the toes."   An abnormal response "called the Babinski's sign, is characterized by an upgoing big toe and fanning outward of the other toes." Plantar Response, Neuroexam.com, http://www.neuroexam.com/neuroexam/ content.php?p=32 (Last accessed June 25, 2012). The presence of the Babinski's sign suggests brain or spinal cord injury.

conclusory fashion without indicating Richardson's physical functional abilities (e.g., ability to stand, walk and sit) states that Richardson is "[t]otally incapacitated" for the period November 25, 2006, to December 8, 2006, because of severe disc herniations.  Id.   There is also an identical document from Dr. Adair dated December 20, 2006, for the period December 21, 2006 to January 4, 2007.[20]  Tr. 259. The administrative record does not include any treatment notes from Dr. Adair.

On December 2, 2006, Richardson underwent an MRI of the lumbar spine at Open MRI of Allentown. Tr. 181.  The MRI scan was reviewed and interpreted by Joel Swartz, M.D. Id.   Dr. Swartz's impression was as follows:

> 1. Congenitally small spinal canal with developmentally attenuated dural sac.[21]
>
> 2. Lower thoracic disc degeneration as described.[22]

---

20.  The document actually states "1/4/06" which we conclude is an error and should be "1/4/07."

21.  The dural sac is defined as "[t]he membranous sac that encases the spinal cord within the bony structure of the vertebral column. Dural refers to the dura, the name of the membrane around the spinal cord (and brain, too)." Definition of Dural sac, MedicineNet.com,http://www.medterms.com/script/main/art.asp?articlekey=40199 (Last accessed June 27, 2012).

22.  Oddly above the impression section of the MRI report in the section entitled "Findings" there is no mention of the thoracic spine just the L1-L5 level of the lumbar spine and the S1 level of the sacral spine.

3. Moderate disc degeneration and disc protrusion
L1-2.

4. Superimposed mild to moderate disc bulging L3-4 and
to a lesser degree at L2-3.

5. Superimposed acquired multifactorial segmental
stenosis resulting in further circumferential
compromise of spinal canal at both L4-5 and L5-S1 as
noted above and clinical correlation is advised
regarding the status of the L4, L5 and S1 nerve roots
as they course through these compromised segments.

Id.

On December 5, 2006, Richardson had an appointment with
Chun Siang Chen, M.D., a neurosurgeon, at Mount Sinai School of
Medicine, New York City, regarding his low back pain and numbness.
Tr. 182-183.  At that appointment, Richardson "denied urinary and
bowel movement dysfunction." Id.  When Dr. Chen reviewed
Richardson's systems,[23] Richardson denied any cardiovascular,
endocrinologic, genitourinary, dermatologic, hematological or
otolaryngological problems. Id.  The results of a physical
examination were essentially normal with the exception that

---

23.  "The review of systems (or symptoms) is a list of questions,
arranged by organ system, designed to uncover dysfunction and
disease." A Practical Guide to Clinical Medicine, University of
California, School of Medicine, San Diego, http://meded.ucsd.edu/
clinicalmed/ros.htm (Last accessed June 27, 2012).

Richardson had decreased sensation on all ten toes. Id. The
decreased sensation was more severe in the bilateral big toes. Id.
Dr. Chen found that Richardson walked normally; he had a normal
tandem walk; he had a negative Romberg sign;[24] he maintained
sensation for vibration and position; he had normal reflexes in
all four extremities; he had a negative Hoffman sign;[25] there was
no clonus[26] and the Babinski sign was absent; he had normal and
symmetric muscle strength in all four extremities; he had normal
coordination; testing of the cranial nerves from 1 to 12 were all
normal and symmetric; he had normal visual acuity and visual
field; and he did not have a meningeal sign.[27]   Tr. 182-183.   Dr.

---

24.   Romberg test is a neurological test to detect poor balance.
It detects the inability to maintain a steady standing posture
with the eyes closed.  See Dorland's Illustrated Medical
Dictionary, 1715 (32nd  Ed. 2012).

25.   The Hoffmann's sign is where "a sudden nipping of the nail
of the index, middle, or ring finger produces flexion of the
terminal phalanx of the thumb and of the second and third phalanx
of some other finger."   Dorland's Illustrated Medical
Dictionary, 1712 (32nd  Ed. 2012).   This test is considered by
some to be a test for cervical spinal cord compression.  See
http://www.pubmedcentral.nih.gov/articlerender.fcgi?artid=1888193
(Last accessed June 27, 2012).

26.   Clonus is defined as "alternate muscular contraction and
relaxation in rapid succession" and "a continuous rhythmic reflex
tremor initiated by the spinal cord below an area of spinal cord
injury, set in motion by reflex testing." Dorland's Illustrated
Medical Dictionary, 373 (32nd  Ed. 2012).

27.   "Meningeal sign" merely refers to a physical/functional sign
suggestive of meningitis.

Chen noted that the recent MRI images were of poor quality and that he could not make a definitive assessment without first obtaining better quality images. Tr. 183.  Dr. Chen ordered an MRI of the lumbar spine. Id.

The follow-up appointment was held on December 21, 2006. Tr. 184.  However, Richardson's insurance company denied the request for an additional MRI and Dr. Chen ordered an EMG[28] and scheduled a follow-up appointment after that test was completed. Id.  Dr. Chen did review the report of Richardson's lumbar CT scans and stated that the report indicated "moderate to severe congenital spinal stenosis of the entire lumbar spine." Id.

The next appointment Richardson had with Dr. Chen was not until March 5, 2007. Tr. 185-186.  At that appointment Richardson stated that his leg weakness and numbness was stable;

---

28. "An electromyogram (EMG) measures the electrical activity of muscles at rest and during contraction. Nerve conduction studies measure how well and how fast the nerves can send electrical signals. . . An EMG is done to: ♦ Find diseases that damage muscle tissue. These problems may include a herniated disc . . . ♦ Find the cause of weakness, paralysis, or muscle twitching. Problems in a muscle, the nerves supplying a muscle, the spinal cord or the area of the brain that controls a muscle can cause these symptoms. The EMG does not show brain or spinal cord disease.  A nerve conduction study is done to: ♦Find damage to the peripheral nervous system, which include all the nerves that lead away from the brain and spinal cord and the smaller nerves that branch out from those nerves . . . ." Electromyogram (EMG) and Nerve Conduction Studies, WebMD, http://www.webmd.com/brain/ electromyogram-emg-and-nerve-conduction-studies (Last accessed June 27, 2012).

he denied leg pain but complained of sacral pain; and he denied
bladder and bowel movement dysfunction. Id.  Dr. Chen's report of
this appointment reveals that Richardson had radiographs of the
lumbar spine conducted on February 22, 2007, which showed lumbar
degenerative disc disease which was more severe at the L4-5 and
L5-S1 levels.[29] Id.   The results of a physical examination were
essentially normal. Id.   Richardson had a normal neurological
examination. Id.  Richardson had intact sensation to touch,
vibration and position. Id.  He had normal muscle strength, tendon
reflexes and coordination. Id.  Dr. Chen noted that Richardson
weighed 370 pounds and told Richardson that he was overweight. Id.
Dr. Chen referred Richardson to a specialist in how to lose
weight.  Id.

      On April 14, 2007, Dr. Chen completed a document
entitled "Attending Physician Statement" for Richardson's
disability insurance carrier, UnumProvident. Tr. 264-265.   In
that document Dr. Chen stated that Richardson's primary diagnosis
was lumbar degenerative disc disease. Tr. 264. Dr. Chen further
stated that Richardson could sit, stand and walk intermittently

--------

29.  The report of the radiographs is not contained within the
administrative record and it is not clear whether Richardson
underwent a CT scan or an MRI of the lumbar spine on February 22,
2007.

and that Richardson drives and walks to his office without
assistance. Tr. 265.

The next appointment Richardson had with Dr. Chen was on
August 2, 2007. Tr. 187-188.  Dr. Chen noted that Richardson "came
to this office with his children. He complains that the legs
weakness and bilateral [below] the sacral area numbness was
stable. The numbness located on both extremities also involved his
ten toes.  He denied leg pain. He does have bilateral sacral pain.
He denied bladder and [bowel movement] dysfunction. He has lost
some weight but he does not [weigh himself]. He drove himself
almost 1 hour and half in order to come to this office visit. He
recently married." Id.  The results of a physical examination were
essentially normal. Id.  Richardson had a normal neurological
examination. Id.  Richardson had intact sensation to touch,
vibration and position. Id.  He had normal muscle strength, tendon
reflexes and coordination. Id.   Dr. Chen's assessment was that
Richardson was overweight and recommended a  weight loss program.
Id.

On February 12, 2008, Richardson had an initial
appointment with Slobodan J. Miric, M.D., a neurologist, in East
Stroudsburg. Tr. 233-234.  At that appointment Richardson told Dr.
Miric that "he developed severe pain and numbness in November
2006, which came on suddenly while he was walking" and that "he

20

suddenly developed a sensation of pain and numbness from the lower
back all the way down to his legs causing numbness in both leg
across (sic) and also in the genital and anal region." Tr. 233.
Richardson told Dr. Miric that "he did lose control of his
bladder, but the numbness stayed persistent including pain." Id.
Richards also told Dr. Miric that he had an MRI performed; that he
had spinal stenosis; that he had seen another neurosurgeon in New
York City, Dr. Chen, who recommended weight loss before surgery;
and that he takes Percocet as needed every 8 hours "with partial
success" in "reducing some pain;" Id.  Richardson denied
headaches, visual changes, shortness of breath or cough, nausea,
vomiting, diarrhea, urinary frequency, incontinence, depression,
anxiety, dizziness, fever, and loss of weight or appetite.  Tr.
233-234.

        The results of physical examination were a "mixed bag."
Richardson had residuals of right eye cataract surgery involving
poor response to light; he had decreased sensation to pinprick in
the L5 distribution;[30] he had tenderness in the paravertebral

---

30.   Another name for the L5 distribution is the L5 dermatome. A
dermatome is an area of the skin mainly supplied by a single
spinal nerve, There are 8 such cervical nerves, 12 thoracic, 5
lumbar and 5 sacral. A problem with a particular nerve root
should correspond with a sensory defect, muscle weakness, etc.,
at the appropriate dermatome. See Stephen Kishner, M.D.,
Dermatomes Anatomy, Medscape Reference, http://emedicine.medscape
.com/article/1878388-overview (Last accessed June 27, 2012). The
                                                (continued...)

musculature at the L4-L5 and L5-S1 levels; his sacroiliac joint showed sign of hypomobility (a decrease in normal movement); his facet joints were tender and lumbar facet joint loading test was positive;[31] he had tenderness in the trochanteric area;[32] and flexion of the spine was limited and produced pain. Tr. 234. The physical examination also revealed, however, that he was alert and oriented to person place and time; he was fluent with normal comprehension, attention and judgment; his affect was appropriate; he had no aphasia;[33] he had no dysarthria;[34] his recent

---

30.  (...continued)
L5 dermatome is located on the posterior and outer surface of the lower limbs and the feet

31.  "The facet joints connect the posterior elements of the [vertebrae] to one another. Like the bones that form other joints in the human body, such as the hip, knee or elbow, the articular surfaces of the facet joints are covered by a layer of smooth cartilage, surrounded by a strong capsule of ligaments, and lubricated by synovial fluid. Just like the hip and the knee, the facet joints can also become arthritic and painful, and they can be a source of back pain.  The pain and discomfort that is caused by degeneration and arthritis of this part of the spine is called facet arthropathy, which simply means a disease or abnormality of the facet joints." Facet Arthropathy, Back.com, http://www.back.com/causes-mechanical-facet.html (Last accessed June 27, 2012). The facet joints are in the back of the spine and act like hinges, There are two superior (top) and two inferior (bottom) portions to each facet joint called the superior and inferior articular processes.

32.  This is an area located near the top of the femur and close to where the femur attaches to the hip bone. See Dorland's Illustrated Medical Dictionary, 1970 (32nd  Ed. 2012).

33.  Aphasia is defined as "any of a large group of language
(continued...)

memory/recall was normal; his motor examination was normal, including normal muscle tone and strength in the upper and lower extremities; his reflexes were essentially normal; and sensation to vibration was intact. Id.

Dr. Miric's assessment was that Richardson suffered from the following conditions: (1) chronic lumbar spinal pain; (2) L5-S1 radiculopathy caused by a herniated nucleus pulposus; (3) a history of lumbar stenosis; (4) sacral plexus involvement;[35] (5) right sacroiliac joint arthropathy; (5) left trochanteric bursitis;[36] and (6) lumbar facet syndrome with secondary

---

33. (...continued)
disorders involving defects or loss of the power of expression by speech, writing, or signs, or of comprehending spoken or written language, due to injury or disease of the brain or to psychogenic causes." Dorland's Illustrated Medical Dictionary, 115 (32nd Ed. 2012).

34. Dysarthria is defined as "a speech disorder consisting of imperfect articulation due to loss of muscular control after damage to the central or peripheral nervous system." Dorland's Illustrated Medical Dictionary, 575 (32nd Ed. 2012).

35. The sacral plexus is bundle of nerves providing motor and sensory nerves for the posterior thigh, most of the lower leg, the entire foot and part of the pelvis. Sacral Plexus Anatomy, Medscape, http://emedicine.medscape.com/article/1899189-overview (Last accessed June 27, 2012)

36. "Trochanteric bursitis is inflammation of the bursa (fluid-filled sac near a joint) at the outside (lateral) point of the hip known as the greater trochanter. When this bursa becomes irritated or inflamed, it causes pain in the hip, This is a common cause of hip pain." Diseases & Conditions, Trochanteric Bursitis, Cleveland Clinic, http://my.clevelandclinic.org/
(continued...)

myofascial pain.[37] Tr. 234-235.  Dr. Miric also stated that
Richardson suffered from a "[t]otal disability" and Richardson was
a surgical candidate because drugs had not alleviated his problem.
Tr. 235.  As for the statement that Richardson suffered from a
total disability, Dr. Miric did not elaborate on Richardson's
functional abilities, including his ability to sit, stand and walk
or when Richardson's "total disability" commenced and how long it
had lasted or was expected to last.  Instead, he only offered a
conclusory statement of disability.  As for the medical plan of
Dr. Miric, he only prescribed medications, ordered an MRI and EMG,
and referred Richardson for a stress test and to a pain
specialist. Tr. 235.

On February 27, 2008, Richardson underwent a
"[c]oncentric needle EMG of both the lower extremities and the
lumbar paraspinal muscles."  The results of this testing were
consistent with right L5 root irritation of an acute nature. Tr.
252.

On March 4, 2008, Richardson was examined by Sethuraman
Muthiah, M.D., on behalf of the Bureau of Disability

---

36.  (...continued)
disorders/bursitis/hic_trochanteric_bursitis.aspx (Last accessed
June 27, 2012).

37.  Myofascial pain refers to localized and radiating pain in
muscle tissue.

Determination. Tr. 189-192 and 194-197.   The results of a physical examination of Richardson by Dr. Muthiah were essentially normal, including normal muscle tone, reflexes and sensation in both lower extremities. Tr. 195-196.   Richardson had no muscle atrophy and a normal gait.   _Id._   Dr. Muthiah found that Richardson suffered from spinal stenosis and degenerative joint disease of the spine. Tr. 196.   Dr. Muthiah also concluded that Richardson had the ability to engage in at least a limited a range of light work.   _Id._   Dr. Muthiah stated that Richardson had no limitations with sitting, could stand and walk 4 hours in an 8-hour workday, and could frequently lift 25 pounds and carry 20 pounds.   Tr. 189 and 196. Dr. Muthiah concluded that Richardson could occasionally bend, kneel, stoop, crouch, balance and climb; Richardson had no environmental restrictions and no limitations with respect to reaching, handling, fingering, feeling, seeing, hearing, speaking, tasting/smelling and continence. Tr. 189-190.

On March 13, 2008, Dr. Miric completed a document entitled "Attending Physician Statement" for Richardson's disability insurance carrier, Unum. Tr. 262-263.   In that document Dr. Miric stated that Richardson's primary diagnosis was lumbar spinal stenosis. Tr. 262.   Dr. Miric further stated that he last examined Richardson on March 7, 2008, and Richardson was still under his care. _Id._   According to Dr. Miric, Richardson